UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

JAMES CHRISTOPHER BRITO, JR.,

               Plaintiff,

        v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

               Defendant.

_____

                           <u>DECISION & ORDER</u>

                           13-CV-6501P

## <u>PRELIMINARY STATEMENT</u>

Plaintiff James Christopher Brito, Jr. ("Brito") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for Supplemental Security Income and Disability Insurance Benefits ("SSI/DIB").  Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge.  (Docket # 13).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (Docket ## 10, 11).  For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and complies with applicable legal standards.  Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Brito's motion for judgment on the pleadings is denied.

# BACKGROUND

## I.   Procedural Background

Brito protectively filed for SSI/DIB on July 15, 2010, alleging disability beginning on June 7, 2010, as a result of left femur, knee and ankle problems.  (Tr. 207, 221-22).[1]  On November 10, 2010, the Social Security Administration denied both of Brito's claims for benefits, finding that he was not disabled.[2]  (Tr. 104-05).  Brito requested and was granted a hearing before Administrative Law Judge Mary Joan McNamara (the "ALJ").  (Tr. 114-15, 144-48).  The ALJ conducted a hearing on November 18, 2011.  (Tr. 52-103).  Brito was represented at the hearing by his attorney, Jason Espinosa, Esq.  (Tr. 52, 186).  In a decision dated December 30, 2011, the ALJ found that Brito was not disabled and was not entitled to benefits.  (Tr. 36-48).

On July 25, 2013, the Appeals Council denied Brito's request for review of the ALJ's decision.  (Tr. 5-11).  In the denial, the Appeals Council indicated that it had considered additional treatment records submitted by Brito, including school records, treatment records from Strong Internal Medicine, and records from Genesee Mental Health Center, but determined that the additional records did not provide a basis for changing the ALJ's decision.  (Tr. 6).  Brito commenced this action on September 17, 2013, seeking review of the Commissioner's decision.  (Docket # 1).

---

[1]  The administrative transcript shall be referred to as "Tr. __."

[2]  Brito previously applied for and was denied benefits in a decision dated October 13, 2005.  (Tr. 222).

## II.    Relevant Medical Evidence[3]

### A.    Treatment Records

#### 1.    Strong Memorial Hospital – Emergency Department

Treatment notes indicate that Brito presented to the Emergency Department at Strong Memorial Hospital ("Strong") on January 4, 2003 with a stab wound in his right posterior shoulder.  (Tr. 266, 277).  Surgery was performed on Brito's shoulder, he was admitted to the hospital, provided Keflex and Vicodin and ultimately discharged.  (*Id.*).

On March 15, 2008, Brito was evaluated at Strong after an assault.  (Tr. 279).  The treatment notes indicate that he had suffered trauma to his head and was intoxicated.  (*Id.*).  Images were taken of Brito's head and chest.  (Tr. 279-80).  The head CT demonstrated no significant intracranial abnormality.  (*Id.*).  The chest x-ray demonstrated a bone fragment near the inferior aspect of the glenoid.  (*Id.*).

#### 2.    University of Rochester Medical Center –Department of Orthopedics

Treatment notes indicate that on January 29, 2005, Brito visited Strong's Emergency Department complaining of pain in his left ankle after slipping on ice.  (Tr. 315-16).  He reported that he was able to bear weight and ambulate after his fall, but was experiencing persistent ankle pain.  (*Id.*).  Brito was evaluated by John P. Goldblatt ("Goldblatt"), MD, who opined that radiographs of the ankle demonstrated an oblique spiral-type proximal fibula fracture.  (*Id.*).  Goldblatt placed Brito's ankle in a splint and recommended that he return for syndesmosis screw fixation surgery to repair his ankle.  (*Id.*).

Treatment notes indicate that on February 1, 2005, Michael Maloney ("Maloney"), MD, a surgeon in the Orthopedics Department of the University of Rochester

---

[3]  Those portions of the treatment records that are relevant to this decision are recounted herein.

Medical Center ("URMC") performed surgery on Brito. (Tr. 317). According to the treatment notes, surgery was recommended based upon a preoperative diagnosis of a fibula fracture. (*Id.*).

On February 17, 2005, Brito attended a post-operative appointment with Goldblatt. (Tr. 313-14). Upon examination, Goldblatt noted that Brito did not appear to be in acute distress and that his cast demonstrated a moderate amount of wear on the bottom despite the fact that he had been advised to avoid bearing weight with that leg. (*Id.*). Goldblatt opined that Brito's wounds were clean, dry and minimally tender with mild swelling at the surgical wound site. (*Id.*). Goldblatt reviewed x-rays taken of his ankle and indicated that they demonstrated that the two ankle screws were intact with a symmetric left ankle mortise. (*Id.*). According to Goldblatt, the x-rays demonstrated that the proximal fibula fracture had not changed in alignment. (*Id.*).

Goldblatt placed a leg cast on Brito's left leg and instructed him to forego any weight-bearing on his left leg. (*Id.*). Goldblatt indicated that he should be excused from work until he was out of his cast and able to bear weight. (*Id.*).

Brito was seen again by Goldblatt on April 7, 2005. (Tr. 311-12). Goldblatt recounted Brito's medical history, indicating that he had undergone surgery for a syndesmotic injury of the left ankle and an associated high fibula fracture. (*Id.*). Goldblatt removed his cast and opined that his incisions were clean, dry and intact. (*Id.*). According to Goldblatt, there was mild tenderness over the incision site, but no tenderness over the proximal fibula fracture and no significant swelling. (*Id.*). A neurological examination of the left lower extremity was normal. (*Id.*). Goldblatt reviewed x-rays taken that day and opined that the position of the screws had not changed and the mortise appeared acceptable. (*Id.*). Additionally, Goldblatt noted evidence of healing of the proximal fibula fracture. (*Id.*).

Goldblatt opined that the proximal fibula fracture was healed, and he transitioned Brito into a high-tied walking boot and recommended progressive weight-bearing as tolerated. (*Id.*).  Goldblatt recommended a follow-up appointment in three weeks.  (*Id.*).  According to Goldblatt, if Brito were able to ambulate without crutches at that time, Goldblatt would consider transitioning him to a lace-up ankle brace and would discuss his return to work.  (*Id.*).

Brito returned for an appointment with Goldblatt on April 28, 2005.  (Tr. 309-10). According to Goldblatt, Brito complained of tenderness to palpation over the skin where the screws had been placed and over his ankle lateral malleolus distally.  (*Id.*).  He reported pain upon bearing weight and noted that he had not attempted to bear weight without the brace.  (*Id.*). Upon examination, Goldblatt noted no swelling, but significant tenderness to very light touch over the skin.  (*Id.*).  According to Goldblatt, Brito's motor and sensory examinations were within normal limits.  (*Id.*).

Goldblatt reviewed a contemporaneous x-ray of Brito's ankle, which demonstrated that the mortise was intact and that the screws had not moved.  (*Id.*).  Goldblatt recommended that Brito continue to bear weight using the fracture walker boot and attend physical therapy.  (*Id.*).  Goldblatt expressed concern that Brito was at risk for developing an early reflex sympathetic dystrophy-type phenomenon and recommended that he frequently rub the area.  (*Id.*).

On June 9, 2005, Brito had another appointment with Goldblatt.  (Tr. 307-08). Brito reported that he had been bearing weight on his left leg in his fracture boot and continued to experience pain along the lateral ankle over the screw heads.  (*Id.*).  Upon examination, Goldblatt noted that Brito did not appear to be in acute distress and that his left lower extremity appeared benign with no significant swelling or malleoli over the percutaneous pin sites.  (*Id.*).

According to Goldblatt, there was no pain with dorsiflexion and plantar flexion of the ankle. (*Id.*).  Goldblatt opined that the ankle was stable and that Brito was neurovascularly intact.  (*Id.*). According to Goldblatt, the hypersensitivity of Brito's skin was in a diffuse area around the lateral malleoli.  (*Id.*).  X-rays revealed that the screws were intact and did not appear to have moved.  (*Id.*).

Goldblatt cleared Brito to bear weight as tolerated and instructed him to wean himself from the fracture boot.  (*Id.*).  Goldblatt completed disability forms indicating that Brito continued to be disabled with restrictions until his next appointment.  (*Id.*).  Goldblatt prescribed physical therapy to assist with weight-bearing.  (*Id.*).  Goldblatt noted that, from an orthopedic standpoint, Brito was stable and he would consider referring Brito to a pain clinic if the pain persisted.  (*Id.*).

On July 21, 2005, Brito returned for a follow-up appointment and was seen by Lucien M. Rouse ("Rouse").  (Tr. 305-06).  He reported that he continued to bear weight on his left leg as tolerated and continued to intermittently wear the fracture walking boot.  (*Id.*).  Brito complained of "excruciating pain" directly along the lateral ankle, over the screw heads, but reported that the pain had somewhat diminished since his last visit.  (*Id.*).  Upon examination, Rouse noted that the incisions on Brito's left leg appeared benign without swelling or erythema. (*Id.*).  Brito continued to demonstrate tenderness over the screw sites, but had no pain upon flexion and was neurovascularly intact.  (*Id.*).

Rouse cleared Brito to return to work but restricted his standing and walking to approximately eight hours.  (*Id.*).  Rouse also provided him with a prescription for physical therapy and instructed him to follow-up in six weeks.  (*Id.*).  Rouse informed Brito that if his pain did not subside by his next appointment, he would be referred to the pain clinic.  (*Id.*).

Rouse also discussed the option of removing the ankle screws if Brito's pain did not resolve. (*Id.*).

### 3.      **Strong Internal Medicine**

On November 4, 2010, Brito attended an appointment with Matthew Wolfe ("Wolfe"), MD, a resident in Strong's Internal Practice Department.[4]   (Tr. 459-60).   According to the treatment notes, the purpose of the appointment was to establish primary care for Brito, who reported that he had not been treated by a primary care physician for the past five years. (*Id.*).   Brito complained of worsening leg and knee pain.   (*Id.*).   He reported that his knee pain was worse with activity, particularly ascending stairs.   (*Id.*).   He also reported minimal right hip pain.   (*Id.*).   According to Brito, he obtained minor relief through the use of acetaminophen and ibuprofen.   (*Id.*).   Brito reported that he was unemployed and attending an alcohol abuse program.   (*Id.*).   Upon examination, Wolfe noted no clubbing, cyanosis or edema in Brito's extremities and assessed no crepitus, effusion or erythema in Brito's knees, although he noted that the left knee was tender to palpation.   (*Id.*).

Wolfe assessed hypertension, osteoarthritis and alcohol abuse in remission.   (*Id.*). He prescribed Amlodipine for the hypertension and Meloxicam for Brito's knee pain, which he suspected was due to osteoarthritis.   (*Id.*).   He also recommended a trial of physical therapy. (*Id.*).

Brito attended a follow-up appointment with Wolfe on January 12, 2011.[5] (Tr. 461-62).   Brito reported that his left leg pain was marginally better since taking Meloxicam, but that he had not been to physical therapy.   (*Id.*).   He reported that he experienced most of his

---

[4]   The notes suggest that Brito was evaluated by Wolfe, who then consulted with his supervising attending physician, Eric Richard, MD, who concurred with the assessment.   (*Id.*).

[5]   The notes suggest that Brito was evaluated by Wolfe, who then consulted with his supervising attending physician, Pricilla Martin, MD, who concurred with the assessment.   (*Id.*).

pain in his left leg and bilateral knees during ambulation.  (*Id.*).  Brito requested a referral to

Genesee Mental Health Center ("GMHC").  (*Id.*).  He reported that he had previously received

treatment there and wanted to return.  (*Id.*).

Upon examination, Wolfe noted no clubbing, cyanosis or edema in Brito's

extremities and assessed no effusion or erythema in Brito's knees, although he noted crepitus in

his knees bilaterally with flexion and extension.  (*Id.*).  Wolfe increased the Meloxicam dosage

and recommended physical therapy and acetaminophen as needed.  (*Id.*).  Wolfe indicated that he

would consider an orthopedic referral if Brito's pain did not improve with medication and

physical therapy.  (*Id.*).  Wolfe opined that Brito's hypertension was better controlled and

recommended a weight loss program.  (*Id.*).

On March 17, 2011, Brito returned for another appointment with Wolfe.[6]

(Tr. 463-64).  Brito reported that he had been receiving treatment at GMHC and attending AA

and was happy with his progress.  (*Id.*).  He anticipated starting a medication regimen prescribed

by GMHC to address his depression and assist his sleep.  (*Id.*).  He also reported continued left

hip and ankle pain.  (*Id.*).  He had not attended physical therapy, but had been exercising at the

YMCA, including swimming in the pool.  (*Id.*).

Wolfe opined that Brito's hypertension was controlled and recommended that

Brito continue to receive treatment at GMHC and to attend AA.  (*Id.*).  With respect to Brito's

osteoarthritis, Wolfe recommended weight loss, physical therapy and continued exercise.  (*Id.*).

Wolfe increased the Meloxicam dosage and provided him with stronger acetaminophen to use as

needed.  (*Id.*).

---

[6]  The notes suggest that Brito was evaluated by Wolfe, who then consulted with his supervising attending physician, Eric Richard, MD, who concurred with the assessment.  (*Id.*).

Brito returned for a follow-up appointment with Wolfe on May 12, 2011.[7]
(Tr. 465-66).  Brito reported that he was exercising more regularly, continued to go to the gym
and was using his bicycle for transportation.  (*Id.*).  He continued to attend AA and had not
consumed alcohol, and his behavioral counseling was helpful.  (*Id.*).  He reported continued knee
pain and requested additional medication.  (*Id.*).  Brito indicated that he had not attended
physical therapy.  (*Id.*).  Wolfe noted that Brito's hypertension was uncontrolled and increased
the Amlodipine dosage.  (*Id.*).  He encouraged Brito to continue his efforts to lose weight, attend
physical therapy and continue his current pain medication regimen.  (*Id.*).

On October 20, 2011, Brito attended an appointment with Christopher
Montgomery ("Montgomery"), MD, at Strong.[8]  (Tr. 467-68).  Brito reported that he continued
to attend AA meetings twice a week and to abstain from alcohol.  (*Id.*).  He anticipated attending
an occupational rehabilitation program and continuing to receive behavioral health treatment.
(*Id.*).  Brito continued to experience leg pain and was taking Nambutone daily and sometimes
used Tylenol.  (*Id.*).

Montgomery opined that Brito's hypertension was well-controlled.  (*Id.*).
Montgomery recommended that he continue with his current pain medication regimen and
encouraged him to participate in an active lifestyle and to lose weight.  (*Id.*).  Brito reported that
he was compliant with his blood-pressure regimen and that he rode his bicycle regularly and
maintained a healthy diet.  (*Id.*).

---

[7]  The notes suggest that Brito was evaluated by Wolfe, who then consulted with his supervising attending
physician, Eric Richard, MD, who concurred with the assessment.  (*Id.*).

[8]  The notes suggest that Brito was evaluated by Montgomery, who then consulted with his supervising
attending physician, Marc Berliant, MD, who concurred with the assessment.  (*Id.*).

4. **Strong Recovery Chemical Dependency**

Treatment records indicate that Brito attended an intake assessment at Strong Recovery Chemical Dependency ("Strong Recovery") on August 4, 2010. (Tr. 449-55). The records suggest that Brito met with Karen Hospers ("Hospers"), MS, CASAC, and Gloria Baciewicz ("Baciewicz"), MD. (*Id.*). Brito was on probation for a 2004 DWI charge and had previously completed outpatient treatment in 2006, following which he had abstained for six months from the use of any mood-altering substances. (*Id.*). Brito was doing well on probation, but reported relapsing to alcohol use when "things go wrong." (*Id.*). Brito reported that his alcohol consumption had recently increased due to the death of his mother, and he was seeking assistance before his drinking got "out of hand." (*Id.*).

Brito reported that he lived alone and relied on the Department of Health and Human Services ("DHS") for financial support, noting that DHS encouraged him to apply for SSI/DIB benefits due to his leg problems. (*Id.*). Brito was married in 2007, but separated in 2008 and was not currently in a significant relationship. (*Id.*). Brito reported that he spent his days riding his bicycle and staying in his house. (*Id.*). Brito reported that he was placed in foster care as a child due to his mother's physical abuse. (*Id.*). Brito's mother died in April 2010, and his nephew was shot and killed in July 2010. (*Id.*).

Brito reported that he had completed the twelfth grade and was unemployed. (*Id.*). His last employment was in an automobile repair shop, but he was terminated due to his inability to perform at the required pace. (*Id.*). According to Brito, he was unable to maintain pace due to his leg problems. (*Id.*). He continued to experience pain in his leg after he broke his ankle and femur during a fall in 2005. (*Id.*). According to Brito, he began consuming alcohol as

a teenager and continues to drink during hard times.  (*Id.*).  Brito reported that he currently was

drinking approximately six wine coolers a day.  (*Id.*).

Upon examination, Brito presented as well-groomed with direct eye contact,

normal speech, cooperative attitude, intact thought processes, normal perception, full orientation,

good concentration, intact memory, average intelligence, moderately-impaired judgment and

poor impulse control.  (*Id.*).  Brito was diagnosed as having alcohol dependence with

physiological dependence and was assessed a Global Assessment of Functioning ("GAF") of 55.

(*Id.*).  He was referred to an intensive treatment program at Strong Recovery, and inpatient

treatment was determined to be unnecessary.  (*Id.*).

On August 10, 2010, Brito attended an admission session at Strong Recovery.

(Tr. 456).  On October 6, 2010, Brito was discharged from the program.  (Tr. 457-58).  The

treatment notes indicate that Brito met with his primary therapist for an initial session on August

24, 2010 and began intensive group treatment on August 30, 2010.  (*Id.*).  He attended the

following two sessions, but cancelled two consecutive sessions thereafter.  (*Id.*).  According to

the notes, Brito's therapist cautioned him about his absences.  (*Id.*).  Brito continued to deny the

extent of his alcohol use and resisted change.  (*Id.*).  Brito attended some additional sessions, but

missed four consecutive sessions between September 27, 2010 and October 4, 2010.  (*Id.*).  He

was thereafter discharged from treatment, and the notes reflect that he achieved none of his

treatment goals as a result of his non-compliance with program rules.  (*Id.*).

## 5. <u>Restart Substance Abuse Services</u>

On October 18, 2010, Brito was referred for outpatient services at Restart

Substance Abuse Services ("Restart").  (Tr. 477).  Brito reported that he was legally obligated to

complete a substance treatment program by his probation officer and DHS.  (*Id.*).  Brito had

recently been enrolled in the Strong Recovery outpatient program but had been discharged due to absences.  (*Id.*).  According to Brito, he had been absent because he needed to care for his ill wife.  (*Id.*).  The treatment notes indicate that Brito was forty-four years old and married.  (*Id.*).  Brito reported that he had previously completed an outpatient rehabilitation program in 2008 but had later relapsed.  (*Id.*).

Brito denied mental health issues and indicated that he was motivated to become sober and explore a healthier way of living.  (*Id.*).  He was admitted into treatment and scheduled for a medical screen on October 27, 2010.  (*Id.*).

Brito's treatment progress was evaluated on September 20, 2011.  (Tr. 470-76).  The review notes indicate that Brito had successfully refrained from consuming alcohol since December 2010.  Brito reported that his relationship with his wife had improved, he had established a primary care physician and he continued to receive mental health treatment through GMHC.  (*Id.*).

### 6.   **GMHC**

Treatment records indicate that Brito attended a pre-admission screening at GMHC on February 7, 2011.  (Tr. 397-99).  Brito reported that he lived alone, was unemployed and had lost his previous job at an automotive repair shop because he was not able to perform the physical requirements of the job due to pain in his ankle, hip and knees.  (*Id.*).  His mother and nephew had recently passed away, and he reported increased symptoms of depression, which caused him to consume more alcohol.  (*Id.*).  He reported that he was currently attending substance abuse treatment at Restart approximately three times a week.  (*Id.*).  Brito reported a history of alcohol abuse and stated that he had last consumed alcohol the previous day.  (*Id.*).  He also reported that he was financially dependent on DHS and had applied for SSI/DIB.  (*Id.*).

In February and March 2011, Brito completed the pre-admission screening process at GMHC after meeting twice with his primary therapist, Amanda Rudd ("Rudd"), LMSW. (Tr. 400-08). During those appointments, Brito complained of negative ruminations, headaches and sleeplessness, and Rudd noted that he demonstrated racing thoughts, negative ruminations and a depressed mood. (*Id.*). Brito reported that he had difficulty sleeping due to racing thoughts and physical pain. (*Id.*). The treatment notes also note that Brito was "coming here to strengthen [his] [SSI/DIB] application." (*Id.*).

Brito had been separated from his wife for the past three years. (*Id.*). He reported that he had been enrolled in special education classes during high school and had obtained his GED when he was incarcerated at the age of eighteen. (*Id.*). Brito reportedly enjoyed riding his bicycle, "doing physical things" and caring for his dog. (*Id.*). Brito reported a lengthy work history, including his most recent employment at an automotive repair shop. (*Id.*). The position was obtained through a temporary agency and lasted only four months. (*Id.*). He stated that because of his physical impairments, he was only able to work odd jobs and could not maintain consistent employment. (*Id.*).

Upon examination, Brito presented as well-groomed and cooperative, with slow speech, organized thought processes, goal-directed thought content, depressed mood, flat affect, full orientation, intact memory, good insight, fair judgment, good concentration and fair impulse control. (*Id.*). Rudd diagnosed Brito with adjustment disorder with depression, alcohol abuse and bereavement, and assessed a GAF of 58. (*Id.*). Brito was admitted into treatment and attended another session with Rudd on March 30, 2011. (*Id.*). During that appointment, Brito reported trouble sleeping and increased stress. (*Id.*).

On April 4, 2011, Brito met with Lewis Mehi-Madrona ("Madrona"), MD, for a medication evaluation.  (Tr. 410-11).  Brito reported a history of high blood pressure, arthritis, chronic pain, trouble sleeping and sometimes hearing "things."  (*Id.*).  He requested medication to aid his sleep.  (*Id.*).  Madrona prescribed Mirtazapine (Remeron).  (*Id.*).  Later that month, on April 18, 2011, Brito attended a medication evaluation with Monika Quistorf ("Quistorf"), a nurse practitioner.  (*Id.*).  Brito reported that Remeron had provided relief.  (*Id.*).  He also denied depressive symptoms and reported that his sleep was somewhat improved.  (*Id.*).  Brito missed an appointment with Rudd on April 21, 2011.  (Tr. 417).

In May 2011, Brito attended two appointments with Rudd.  (Tr. 418, 420).  During those appointments, Brito continued to exhibit depressed mood, racing thoughts and negative ruminations.  (*Id.*).  Despite this, Rudd indicated that he was calm, cooperative, and demonstrated good eye contact, logical and goal-directed thoughts, appropriate affect, fair insight, intact memory and full orientation.  (*Id.*).  He reported that his sleep had improved and he continued to make progress in substance abuse treatment.  (*Id.*).  According to Brito, he had abstained from alcohol consumption since April 22, 2011.  (*Id.*).

Later that month, on May 27, 2011, Brito attended an appointment with Madrona for review of his medications.  (Tr. 421-24).  Madrona indicated that he would be leaving GMHC and that his care would be transferred to another physician.  (*Id.*).  Upon examination, Brito was alert, cooperative, and demonstrated clear speech, logical thoughts, euthymic mood and affect, full orientation, intact memory, fair insight and good judgment.  (*Id.*).  Madrona increased the Mirtazapine dosage and recommended a follow-up appointment in four weeks.  (*Id.*).

During June 2011, Brito met with Rudd and Quistorf. (Tr. 425-36). Rudd indicated that Brito continued to progress in his substance abuse treatment program, although he also continued to demonstrate low mood and grief processing. (*Id.*). Brito reported to Quistorf that he was not sleeping well and that he experienced mild depressive symptoms. (*Id.*). Quistorf discontinued Remeron and prescribed Oleptro to help with sleep and depression. (*Id.*).

On July 20, 2011, Brito attended a therapy session with Rudd. (Tr. 427). During the session, Brito reported racing thoughts and negative ruminations. (*Id.*). He indicated that his medications were working and that he was sleeping better. (*Id.*). He had negative thoughts concerning an upcoming court date, along with several stressors, including thoughts of his mother, his SSI/DIB appeal and health issues. (*Id.*). Brito met with Saleem Ismail ("Ismail"), MD, on July 26, 2011 for a medication review. (Tr. 428). He reported improved sleep and that he spent his days attending substance abuse treatment, riding his bicycle and walking his dog. (*Id.*). Ismail increased his Oleptro dosage. (*Id.*).

During August 2011, Brito met with Rudd for two therapy sessions and with Quistorf once for a medication review. (Tr. 429-31). According to Rudd, Brito continued to process his grief, experience low moods and have negative ruminations. (*Id.*). He was scheduled to finish his substance abuse group therapy that month and was planning to follow-up with VESID. (*Id.*). Rudd also encouraged Brito to consider attending the PROS program and grief groups. (*Id.*). Brito told Quistorf that he was feeling less depressed and had been sleeping better. (*Id.*). Quistorf continued his prescription for Oleptro. (*Id.*).

During September and October 2011, Brito met with Rudd twice and with Ismail once. (Tr. 432, 548-49). Brito continued to report racing thoughts and increased stress. (*Id.*). Rudd noted that Brito was well-groomed, cooperative and demonstrated good eye contact,

appropriate behavior, appropriate speech, logical and goal-directed thought processes, appropriate affect, fair to good insight, appropriate judgment, full orientation and intact memory. (*Id.*).  Brito reported increased feelings of depression because a friend had passed away from drinking.  (*Id.*).  Additionally, he continued to feel stress about probation and an upcoming SSI/DIB hearing.  (*Id.*).  Brito told Ismail that he was sleeping better and that he was not feeling as depressed.  (*Id.*).  He spent his days attending AA meetings, riding his bicycle and watching movies.  (*Id.*).  Ismail increased his Oleptro dosage.  (*Id.*).

During November 2011, Brito attended two therapy sessions with Rudd. (Tr. 550-51).  Brito continued to complain of low mood, ruminating thoughts and pain, and explained that he was struggling with his mood due to the recent loss of a friend and the upcoming holidays without his mother.  (*Id.*).  Rudd noted Brito's depressed mood and negative ruminations, but otherwise found him to be cooperative and well-groomed, with appropriate eye contact, behavior, judgment, affect and speech, goal-directed thoughts, full orientation, fair insight, intact memory and full orientation.  (*Id.*).  Rudd indicated that she had completed paperwork for Brito's SSI/DIB proceedings.  (*Id.*).

During January 2012, Brito attended two therapy sessions with Rudd and attended two medication evaluations.  (Tr. 52-55).  Brito began the month with positive feelings, noting that he had finished probation and was continuing to work on his sobriety, but later presented with a low mood, anger and negative ruminations, explaining that he had some issues since his last visit.  (*Id.*).  Brito told Ismail that he had negative feelings over his inability to obtain work due to his lack of a high school diploma and his ongoing physical impairments and the insufficiency of his financial support.  (*Id.*).  Additionally, Brito reported that he was frustrated by the denial of his application for SSI/DIB, but planned to appeal.  (*Id.*).  By the end of the

month, Quistorf described Brito as only "mildly depressed," although he continued to express

anger concerning the SSI/DIB determination.  (*Id.*).

During February and March 2012, Brito attended three therapy sessions with

Rudd.  (Tr. 556-58).  Initially, Brito continued to demonstrate low mood, increased stress and

negative ruminations.  (*Id.*).  Despite his low mood, he planned to attend a workshop for job

readiness through the Recovery Network.  (*Id.*).  He subsequently reported feeling better and

attributed his positive mood to his plans to attend the workshop twenty hours a week and his

physical therapy at the YMCA pool.  (*Id.*).

During April 2012, Brito attended a therapy session with Rudd and a medication

evaluation appointment with Ismail.  (Tr. 559-60).  Brito reported to Rudd that things were

"[g]oing great, can't complain."  (*Id.*).  He was complying with his medication regimen and

attending the workshop through the Recovery Network.  (*Id.*).  He continued to experience

ongoing pain in his leg and was appealing the negative SSI/DIB determination.  (*Id.*).  Brito told

Ismail that he had run out of his medications, but they were helping him, and he was no longer

depressed and was sleeping more.  (*Id.*).  Ismail continued his Oleptro and Cymbalta

prescriptions.  (*Id.*).

In May 2012, Brito attended a therapy session with Rudd and a session with

Patricia Wyjad ("Wyjad"), LMSW, who had replaced Rudd during a leave of absence.

(Tr. 561-64).  During the sessions, Brito demonstrated low moods, racing thoughts and worry.

(*Id.*).  He reported that his step-father had recently passed away and he was feeling mildly

distressed.  (*Id.*).  He continued to attend the workshop through the Recovery Network and hoped

to return to work, although he continued to pursue SSI/DIB.  (*Id.*).

During June and July 2012, Brito met with Wyjad and Ismail each once. (Tr. 565-67).  Brito told Wyjad that his depressive symptoms were stable, although he was experiencing some anxiety.  (*Id.*).  He was frustrated because he was unable to work due to his physical limitations, and Wyjad encouraged him to attend VESID for vocational assistance. (*Id.*).  He reported a brief depressive episode arising from the loss of his mother, but reported that he had spent time with his wife, which had had a positive effect.  (*Id.*).  Brito also reported that he had recently been charged with drug possession.  (*Id.*).  Brito told Ismail that he was not experiencing any depression, and Ismail continued his prescriptions for Oleptro and Cymbalta. (*Id.*).

On August 15, 2012, Brito attended another appointment with Wyjad.  (Tr. 568). According to Brito, his recent charge for drug possession had exacerbated his depressive symptoms, but he continued to attend his workshop and physical therapy.  (*Id.*).  After that session, Brito's care was transferred back to Rudd.  (Tr. 569).  Wyjad indicated to Rudd that Brito's symptoms remained stable "overall" and that he had been sentenced to ten weekends in jail for the possession charge.  (*Id.*).

Brito attended two therapy sessions with Rudd during September and October 2012.  (Tr. 570-71).  He continued to demonstrate depressed mood and ruminating thoughts. (*Id.*).  Despite his low mood, Brito continued to work on his SSI/DIB appeal, attend the Recovery Network workshop, stay sober and take his medications.  (*Id.*).

On November 6, 2012, Brito attended a therapy session with Rudd.  (Tr. 572). According to Rudd, although he continued to have ruminating thoughts, he also continued to work positively and to refocus himself.  (*Id.*).  Later that month, Brito attended a medication evaluation appointment with JoAnn Strub ("Strub"), a nurse practitioner.  (Tr. 573).  He reported

doing well and that his medications were helping him "greatly," but that the upcoming holidays were making him feel somewhat down because his mother had died during the holiday season. (*Id.*).

### B.   **Medical Opinion Evidence**

#### 1.   **Samuel Balderman, MD**

On September 8, 2010, state examiner Samuel Balderman ("Balderman"), MD, conducted a consultative internal medicine examination of Brito.  (Tr. 333-38).  Brito reported intermittent, moderate, sharp pain in his left ankle since his 2005 surgery.  (*Id.*).  Medications provided partial relief for his pain.  (*Id.*).  Brito also reported that he was attending an alcohol rehabilitation program two to three times a week.  (*Id.*).  Brito reported that he had last worked in July 2010 at an automobile repair shop.  (*Id.*).  According to Brito, he was able to cook and clean, care for his personal hygiene and enjoyed watching television, listening to the radio and reading.  (*Id.*).

Upon examination, Balderman noted that Brito did not appear to be in acute distress and had a slight limp that favored his left side.  (*Id.*).  Brito was able to walk on his heels, but not his toes and could squat fully.  (*Id.*).  He used no assistive devices and had no difficulty getting on and off the exam table and changing for the exam.  (*Id.*).  He was able to rise from his chair without difficulty.  (*Id.*).

Balderman noted that Brito's cervical and lumbar spine showed full flexion, extension, lateral flexion bilaterally and full rotary movement bilaterally.  (*Id.*).  Balderman identified no scoliosis, kyphosis or abnormality in his thoracic spine.  (*Id.*).  The straight leg raise was negative bilaterally.  (*Id.*).  Balderman found full range of motion in the shoulders, elbows, forearms and wrists.  (*Id.*).  He also found full range of motion in Brito's hips, knees and ankles

bilaterally.  (*Id.*).  Balderman noted mild tenderness of the left ankle but no redness, heat, swelling or effusion.  (*Id.*).  Balderman assessed strength as five out of five in the upper and lower extremities with no sensory deficits or evidence of atrophy.  (*Id.*).  Balderman found Brito's hand and finger dexterity to be intact and his grip strength to be five out of five bilaterally.  (*Id.*).  Balderman also reviewed an x-ray of Brito's left leg that indicated a healed or healing nondisplaced fracture of the proximal fibular shaft, but was otherwise unremarkable. (*Id.*).  He also reviewed an x-ray of Brito's left ankle that demonstrated two orthopedic screws with postsurgical or posttraumatic calcification at the tibiofibular syndesmosis, but was otherwise unremarkable.  (*Id.*).

Balderman diagnosed Brito with a history of alcohol and marijuana abuse and status post left ankle fracture.  (*Id.*).  He opined that Brito's prognosis was stable and that he had mild limitations for climbing and prolonged walking due to the old left ankle fracture.  (*Id.*).  He noted that the x-ray of the left ankle should be reviewed.  (*Id.*).

## 2. Adele Jones, PhD

On October 19, 2010, state examiner Adele Jones ("Jones"), PhD, conducted a consultative psychiatric evaluation of Brito.  (Tr. 339-43).  Brito reported that he took a bus to the examination.  (*Id.*).  Brito also reported that he had completed the tenth grade and had been in special education classes after eighth grade for a learning disability in reading and math.  (*Id.*). Brito had been employed most recently in May 2010 at a temporary job unloading tractor trailers.  (*Id.*).  He had held that job on and off for approximately six months before being laid off.  (*Id.*).  He reported previous employment as a janitor and indicated that he had once been fired due to alcohol use.  (*Id.*).

According to Brito, he had been hospitalized in 2004 for two days for detoxification and was not currently receiving mental health treatment.  (*Id.*).  He reported pain in his knee and ankle since having surgery after he fell on ice.  (*Id.*).  Brito reported waking during the night and loss of appetite.  (*Id.*).  During the evaluation, he reported feeling both "pretty good" and always depressed.  (*Id.*).  He explained that he had experienced three losses that year – the deaths of this mother and nephew, and the loss of his job.  (*Id.*).  He described feeling down for hours at a time, and experiencing crying episodes, increased irritability, chronically diminished self-esteem and occasional diminished sense of pleasure.  (*Id.*).  He reported fleeting thoughts of suicide but no history of attempts, and intoxication-related hallucinations.  (*Id.*).  He reported short and long term memory deficits, concentration difficulties and chronic difficulty learning new material.  (*Id.*).

Brito reported a fifteen-year history of alcohol consumption and that he had last used alcohol two days prior to the evaluation.  (*Id.*).  His longest period of sobriety had been five months and he was scheduled to begin a substance abuse treatment program the following week.  (*Id.*).

Brito reported that he had been living with his sister for the previous four months.  (*Id.*).  He was able to care for his personal hygiene, but his sister performed all the cooking and household chores.  (*Id.*).  According to Brito, his sister did not permit him to use the stove because he had previously left it on when intoxicated.  (*Id.*).  Additionally, his sister did not permit him to use her cleaning supplies and appliances.  (*Id.*).  Brito had previously mismanaged his money by spending it on alcohol.  (*Id.*).  He reported that he no longer drove, but was able to use public transportation.  (*Id.*).  He indicated that he gets along well with his family and friends.

(*Id.*).  His hobbies include bicycling and making plastic models.  (*Id.*).  He used to play basketball, but has not played since his 2005 surgery.  (*Id.*).

Upon examination, Jones noted that Brito appeared casually dressed and groomed.  (*Id.*).  Jones opined that Brito had fluent and clear speech with adequate language, coherent and goal-directed thought processes, full range affect, neutral mood, clear sensorium, full orientation, fair insight, fair judgment and low average intellectual functioning with a somewhat limited general fund of information.  (*Id.*).  Jones noted that Brito's attention and concentration were intact.  (*Id.*).  According to Jones, Brito could count, perform simple calculations and complete the serial threes, although he made some mistakes.  Jones opined that Brito's mistakes owed to his limited education and history of a learning disability.  (*Id.*).  Brito's memory skills were mildly impaired likely due to his low intellectual functioning.  (*Id.*).  According to Jones, Brito could recall three objects immediately, two out of three objects after five minutes and could complete seven digits forward and three digits backward.  (*Id.*).

According to Jones, Brito could follow and understand simple directions and instructions, perform simple and complex tasks independently, maintain attention and concentration, maintain a regular schedule and learn new tasks, make appropriate decisions, and relate adequately with others.  (*Id.*).  Jones opined that Brito had chronic problems learning new tasks and that he was unable to appropriately deal with stress, "as he only does so by drinking." (*Id.*).  According to Jones, Brito appeared to suffer from psychiatric and substance abuse problems, although they did not appear to interfere with his ability to function on a daily basis. (*Id.*).  Jones opined that Brito's prognosis was good given treatment and sobriety.  (*Id.*).

### 3.    L. Blackwell, Psychology

On November 1, 2010, agency medical consultant L. Blackwell ("Blackwell"),
MD, completed a Psychiatric Review Technique.  (Tr. 356-69).  Blackwell concluded that
Brito's mental impairments did not meet or equal a listed impairment.  (Tr. 356, 359, 364).
According to Blackwell, Brito suffered from mild limitations in his activities of daily living and
ability to maintain social functioning, and moderate limitations in his ability to maintain
concentration, persistence or pace.  (Tr. 366).  According to Blackwell, Brito had not suffered
from repeated episodes of deterioration.  (*Id.*).  Blackwell completed a mental Residual
Functional Capacity ("RFC") assessment.  (Tr. 370-73).  Blackwell opined that Brito suffered
from moderate limitations in his ability to perform activities on a schedule, maintain regular
attendance and be punctual within customary tolerances, complete a normal workday and
workweek without interruptions from psychologically-based symptoms, and to perform at a
consistent pace without an unreasonable number and length of rest periods.  (Tr. 371).

In support of her assessment, Blackwell reviewed Brito's school records and the
consultative examination performed by Jones.  (Tr. 371-72).  Blackwell opined that Brito
appeared able to sustain employment, but that his level of alcohol use might cause moderate
limitations in his ability to sustain a regular schedule and complete a normal workday.  (*Id.*).

### 4.    Montgomery's Opinion

On October 27, 2011, Montgomery completed a medical source statement
regarding Brito's physical ability to perform work-related activities.  (Tr. 438-43).  Montgomery
opined that Brito was able frequently[9] to carry up to twenty pounds and occasionally[10] to carry
up to one hundred pounds.  (*Id.*).  He further opined that Brito could sit for up to four hours at a

---

[9]  "Frequently" was defined as "one-third to two-thirds of the time."  (*Id.*).

[10]  "Occasionally" was defined as "very little to one-third of the time."  (*Id.*).

time without interruption and could stand or walk up to one or two hours at a time without interruption.[11]  (*Id.*).  According to Montgomery, Brito was able to sit for up to six hours, stand for up to four hours, and walk for up to four hours during an eight-hour workday.  (*Id.*).  Montgomery opined that Brito did not need a cane to ambulate.  (*Id.*).

According to Montgomery, Brito could frequently reach, handle, finger, feel, push, pull, operate foot controls, and balance.  (*Id.*).  He could occasionally stoop, kneel, crouch, crawl, and climb stairs, ramps, ladders or scaffolds.  (*Id.*).  Additionally, Brito could frequently be exposed to unprotected heights, moving mechanical parts, humidity, wetness and vibrations.  (*Id.*).  Montgomery opined that Brito could occasionally be exposed to extreme cold or heat and could tolerate moderate noise in the workplace.  (*Id.*).  Montgomery also completed a medical source statement regarding Brito's mental ability to perform work-related functions and opined that Brito did not suffer from any mental limitations.  (Tr. 445-47).

## 5.    Rudd's Opinion

On November 10, 2011, Rudd completed a medical source statement regarding Brito's mental ability to do work-related activities.  (Tr. 434-36).  Rudd opined that Brito suffered from moderate[12] limitations in his ability to understand and remember complex instructions, mild[13] limitations in his ability to make judgments on simple and complex work-related decisions and carry out complex instructions, and no limitations[14] in his ability to

---

[11]  The medical source statement is unclear as to whether Montgomery believed Brito was limited to one or two hours; both boxes were checked on the form, and this Court cannot determine which box was the intended response and which was checked in error.  (*Id.*).

[12]  "Moderate" was defined to indicate that there "is more than a slight limitation in this area but the individual is still able to function satisfactorily."  (*Id.*).

[13]  "Mild" was defined to indicate that there "is a slight limitation in this area but the individual can generally function well."  (*Id.*).

[14]  "None [no limitations]" was defined to indicate that limitations were "absent or minimal" or "if limitations [were] present[,] they are transient and/or expected reactions to psychological stresses."  (*Id.*).

understand, remember and carry out simple instructions.  (*Id.*).  According to Rudd, she assessed

these limitations because Brito's depression affected his ability to concentrate on, and his

motivation to carry out, tasks and roles.  (*Id.*).

Rudd also opined that Brito suffered from moderate limitations in his ability to

respond appropriately to usual work situations and to changes in a routine work setting, and no

limitations in his ability to respond appropriately to the public, supervisors or coworkers.  (*Id.*).

According to Rudd, she assessed moderate limitations in Brito's ability to respond to usual work

situations and changes in a routine work setting because Brito suffered from "mood instability"

that caused him "difficulty managing routine[s] at times."  (*Id.*).  Additionally, Rudd noted that

some of his medications might have adverse side effects and that his sleep was "strongly

impacted without medication."  (*Id.*).  According to Rudd, Brito also might experience difficulty

talking with others due to his difficulty concentrating.  (*Id.*).  Finally Rudd noted that Brito had a

history of alcohol abuse, but had been abstinent for approximately ten months with continuing

symptoms of depression.  (*Id.*).


## III.   <u>Non-Medical Evidence</u>

### A.   <u>School Records</u>

School records indicate that Brito repeated the third grade once and the eighth

grade twice.  (Tr. 259).  During the ninth grade, Brito demonstrated poor attendance and was

failing Math, Science and English.  (*Id.*).  He was evaluated for special education services that

year by Harold A. Schwarz ("Schwarz"), a certified school psychologist.  (Tr. 260).  Testing

demonstrated that Brito had a Full Scale Intelligence Quotient of 83.  (Tr. 491).  Schwarz noted

that Brito had an unstable home life and had been placed in multiple foster homes.  (Tr. 259).

Schwarz recommended that Brito be classified as "ED" and placed into programming to assist his performance in school.  (Tr. 261).

   **B.**   **Application for Benefits**

In his application for benefits, Brito reported that he had been born in 1966. (Tr. 221).  He reported that he had completed the twelfth grade in a special education classroom setting.  (Tr. 207-08).  According to Brito, he had previously been employed as a forklift operator, an assembly line worker, a maintenance employee, a painter and a sorter in a junk yard. (*Id.*).

Brito reported that he lived in a house by himself.  (Tr. 225).  He was able to care for his own personal hygiene and did not take care of other people or pets.  (Tr. 226).  Brito was able to prepare his own meals daily and could perform household chores, without assistance, including watering the grass, painting, laundry and cleaning.  (Tr. 227).  Brito reported that he left his house almost every day and used public transportation.  (Tr. 228).  Brito no longer had a driver's license because he owed fines.  (*Id.*).  Brito reported that he went shopping monthly for groceries and clothing.  (*Id.*).  Brito was able to handle his own finances.  (Tr. 229).

According to Brito, he enjoyed watching television and movies and was no longer able to play sports.  (*Id.*).  He also spent time with others and went to the library once a week. (*Id.*).  Brito reported that he did not have any problems getting along with others, had no problems paying attention and could follow written and spoken directions.  (Tr. 229, 231).  Brito reported that stress could cause his mood to change and that he sometimes had memory problems.  (Tr. 232).

Brito reported that his physical impairments limited his ability to bend down, stand, walk, sit, climb stairs, kneel and squat.  (Tr. 230).  He sometimes used a non-prescribed

cane to ambulate when walking distances.  (Tr. 231).  Brito estimated that he could walk about two hundred feet before needing to rest for five minutes.  (*Id.*).

Brito reported that he had first begun experiencing ankle and knee pain after he broke his ankle and femur during an accident.  (Tr. 232).  He described the pain as a stabbing ache.  (*Id.*).  He reported that he continued to experience daily pain, which was exacerbated by walking and climbing stairs.  (Tr. 233).  The pain lasted all day, and he took Tylenol and aspirin three to four times daily to alleviate the pain.  (*Id.*).  According to Brito, the medication relieved his pain for up to two hours and did not cause any side effects.  (*Id.*).  He also used a cane and an ace bandage to relieve his pain.  (Tr. 234).

### C.   **Administrative Hearing Testimony**

During the administrative hearing, Brito testified that he had completed the tenth grade and had not obtained his GED.  (Tr. 62).  Brito testified that he had previously worked as a maintenance worker in 2010.  (Tr. 63).  Brito worked with his brother-in-law and performed tasks including plumbing, painting, installing dry wall, and other miscellaneous home repair tasks.  (*Id.*).  He stopped working when the company went out of business.  (Tr. 63-64).  According to Brito, his leg started to bother him due to the physical exertions of the job.  (*Id.*).  He was taking Tylenol at that time to manage his pain, and he decided to seek medical treatment.  (*Id.*).

Brito testified that he had been treated by several different primary care physicians at Strong.  (Tr. 65-66).  His doctors told him that his increased weight was adding pressure on his leg and prescribed medication, including Amlodipine and Meloxicam.  (*Id.*).  They diagnosed arthritis in his hip and in both knees.  (*Id.*).  According to Brito, his doctors advised him to take long walks and, after learning that he experienced leg pain when walking,

instructed him to use a cane.  (*Id.*).  Brito testified that he walks approximately three times a week.  (*Id.*).

Brito testified that he attends group recovery therapy twice a week in the mornings and attends another group therapy program four times a week in the evenings. (Tr. 69-70).  According to Brito, he must attend the evening group therapy in order to maintain his DHS benefits.  (*Id.*).  Brito testified that he used to drink heavily, but stopped drinking in December 2010, although he admitted he had consumed a wine cooler two days before the hearing.  (Tr. 73-75).

Brito lives with his sister, who does the household cooking, cleaning and laundry with assistance from her husband.  (Tr. 66-67).  According to Brito, his sister does not allow him to help with the chores, but he cleans his own room.  (*Id.*).  When the weather is nice, Brito spends his days exercising his leg or riding his bicycle.  (Tr. 72).  When it is colder, Brito stays indoors watching movies or reading.  (Tr. 72, 76, 91).

Brito testified that he also receives mental health treatment twice a week at GMHC.  (Tr. 70).  Brito was initially prescribed Remeron to assist his sleep, but he was bothered by "weird" dreams.  (Tr. 84).  He was subsequently prescribed Oleptro to aid his sleep and address his depression.  (Tr. 75, 77).  According to Brito, the Oleptro has improved his sleep, and he is now able to sleep through the night.  (*Id.*).  Brito reported that Oleptro relaxes him and is more effective than Remeron.  (Tr. 84, 90).  Brito reported that he experienced bad hallucinations when intoxicated, and since he has been sober, he sometimes "hear[s] things" like somebody talking.  (Tr. 76, 90).

Brito testified that he experiences increased stress during the holidays because his mother passed away during the holiday season.  (Tr. 80).  He also experiences depression.

28

(Tr. 82-83).  From time to time, he thinks about negative experiences from his past, especially if he sees something that triggers a memory.  (Tr. 83, 86).  These episodes occur approximately three times a week and cause him to cry for approximately twenty minutes.  (Tr. 85-86).

Brito testified that he also suffers from high blood pressure and headaches. (Tr. 77).  According to Brito, he experiences headaches when his blood pressure is too high and is able to obtain relief by taking his medication and lying down.  (Tr. 77-78).  Brito testified that he does not have any problems with his hands, but sometimes experiences pain in his lower back. (Tr. 79-80).  Brito testified that he does not experience any other symptoms or problems. (Tr. 80).  Brito believes that he is unable to work due to its physical demands, including standing, stooping, walking up and down steps and bending over.  (Tr. 92).  Brito does not believe he would be able to perform a job that requires sitting for most of the day because he would need to alternate between standing and sitting every thirty minutes due to his arthritis. (Tr. 92-93).

Vocational expert, James R. Newtown ("Newton"), also testified during the hearing.  (Tr. 95-102, 171).  The ALJ asked Newton to characterize Brito's previous employment.  (Tr. 95)  According to Newton, Brito previously had been employed as a clean-up worker, a general laborer and a forklift operator.  (*Id.*).

The ALJ asked Newton whether a person would be able to perform Brito's previous jobs who was the same age as Brito, with the same education and vocational profile, and who was able to perform the full range of light work, who could stand, walk or sit up to six hours during an eight-hour workday, push and pull without limitation, only occasionally climb ramps and stairs and never climb ladders ropes or scaffolds, occasionally balance, stoop, kneel, crouch and crawl, who could understand simple and complex instructions, carry out complex

tasks independently, maintain attention and concentration, maintain a regular schedule, relate appropriately with others, and who should be in a low-stress environment. (Tr. 96). Newton testified that such an individual would be unable to perform the previously-identified jobs, but would be able to perform other positions in the national economy, including table worker, conveyor line baker and gate attendant. (Tr. 96-97).

The ALJ then asked Newton whether jobs would exist for the same individual with the same limitations, except that the individual would need to be able to sit and stand at will. (Tr. 97). Newton opined that such an individual could perform the previously-identified jobs of table worker, conveyor line baker and gate attendant. (Tr. 97-98). The ALJ then asked Newton whether jobs would exist for the same individual with the same limitations, except that the individual would be off-task approximately twenty percent or more of the workday. (Tr. 98). Newton opined that such an individual would not be able to maintain full-time competitive employment. (*Id.*). Brito's attorney then asked Newton whether a similarly-limited individual who would experience two, unscheduled twenty-minute disruptions during the workday would be able to maintain competitive employment. (Tr. 101). Newton testified that he would not. (*Id.*).

## DISCUSSION

### I.   Standard of Review

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards. *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether

the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise."  *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).  When assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis.  *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*).  The five steps are:

(1)     whether the claimant is currently engaged in substantial gainful activity;

(2)     if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

(3)     if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;

(4)     if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and

(5)     if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.  "The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'"  *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

A.     **The ALJ's Decision**

In her decision, the ALJ followed the required five-step analysis for evaluating disability claims.  (Tr. 36-48).  Under step one of the process, the ALJ found that Brito had not

32

engaged in substantial gainful activity since June 7, 2010, the alleged onset date.  (Tr. 38).  At

step two, the ALJ concluded that Brito has the severe impairment of osteoarthritis of the knee.

(*Id.*).  The ALJ determined that Brito's status post-open reduction and internal fixation in the left

ankle and hypertension were nonsevere.  (*Id.*).  Further, the ALJ determined that Brito's mental

impairments, including alcohol abuse in remission, learning disability and depression, were

nonsevere.  (Tr. 39-42).  With respect to Brito's mental impairments, the ALJ found that Brito

suffered from mild limitations in maintaining concentration, persistence and pace, and social

functioning, and in performing activities of daily living.  (*Id.*).  At step three, the ALJ determined

that Brito does not have an impairment (or combination of impairments) that meets or medically

equals one of the listed impairments.  (Tr. 42).  The ALJ concluded that Brito has the RFC to

perform light work, except that he would need a sit/stand option, could only occasionally climb

ramps and stairs, never climb ladders ropes or scaffolds, occasionally balance, stoop, kneel,

crouch and crawl, and that he could follow and understand both simple and complex instructions,

perform complex tasks independently, maintain attention and concentration as necessary,

maintain a regular schedule, relate appropriately with others, but should work in a low-stress

environment.  (*Id.*).   Finally, at steps four and five, the ALJ determined that Brito was unable to

perform his previous work, but that other jobs existed in the national and regional economy that

he could perform, including the positions of table worker, conveyor line bakery worker and gate

attendant.  (Tr. 46-47).  Accordingly, the ALJ found that Brito was not disabled.  (*Id.*).

**B.**    **Brito's Contentions**

Brito contends that the ALJ's disability RFC determination is not supported by

substantial evidence and is the product of legal error.  (Docket # 10-1).  First, he contends that

the Appeals Council erred by failing to properly consider GMHC treating records submitted on

appeal.  (*Id.* at 12-16).  Next, Brito argues that the ALJ mischaracterized the medical evidence.

(*Id.* at 16-19).  Additionally, Brito challenges the physical RFC assessment on the grounds that it

failed to account for limitations assessed by Montgomery and was not otherwise supported by

substantial evidence.  (*Id.* at 19-23).  Further, he challenges the mental RFC assessment on the

grounds that it failed to account for Rudd's opinion and was not supported by substantial

evidence.  (*Id.* at 23-27).  Finally, Brito contends that the ALJ's step five determination was not

based upon substantial evidence because the hypothetical posed to the vocational expert was

based upon a flawed RFC analysis.  (*Id.* at 27-29).

## II.     Analysis

### A.      Mental RFC Assessment

Brito challenges the ALJ's determination that his mental impairments were not

severe and the ALJ's mental RFC assessment.  First, Brito contends that the Appeals Council

erred by failing to properly consider the GMHC mental health treatment records submitted on

appeal.[15]  (*Id.* at 12-16).  Brito also contends that the ALJ failed to assign a specific weight to

Rudd's opinion and improperly relied upon Jones's opinion.  (*Id.* at 23-26).  Finally, Brito

maintains that the ALJ inaccurately described the medical evidence of record, resulting in error.

(*Id.* at 16-19).

---

[15]  The records submitted to the Appeals Council consisted of GMHC treatment records between September 2011 and November 2012 and comprised seventy-nine pages.  (Tr. 500-78).  The Appeals Council stated that it considered the records dated between September 2011 and November 2011, presumably because those records predate the ALJ's decision and the remaining records do not.  (Tr. 6).  Yet, the Appeals Council also stated that it considered all seventy-nine pages.  (*Id.*).  Thus, the record is unclear as to whether the Appeals Council considered all of the GMHC records submitted on appeal.  That ambiguity, however, is immaterial because this Court has reviewed and considered all of them.

1.      **GMHC Records**

Brito challenges the ALJ's determination that his mental impairments were not severe and the mental RFC assessment on the grounds that his mental health treatment records were not properly evaluated by the Appeals Council.

The regulations require the Appeals Council to consider "new and material" evidence if "it relates to the period on or before the date of the [ALJ's] hearing decision."  20 C.F.R. §§ 404.970(b), 416.1470(b); *see Perez v. Chater*, 77 F.3d 41, 44 (2d Cir. 1996).  The Appeals Council, after evaluating the entire record, including the newly-submitted evidence, must "then review the case if it finds that the [ALJ's] action, findings, or conclusion is contrary to the weight of evidence currently of record."  20 C.F.R. §§ 404.970(b), 416.1470(b); *Rutkowski v. Astrue*, 368 F. App'x 226, 229 (2d Cir. 2010).  If "the Appeals Council denies review after considering new evidence, the [Commissioner's] final decision necessarily includes the Appeals Council's conclusion that the ALJ's findings remained correct despite the new evidence."  *Perez v. Chater*, 77 F.3d at 45 (internal quotation omitted).  The newly-submitted evidence then becomes part of the administrative record and is subject to review.  *See id.*  "The role of the district court is to review whether the Appeals Council's action was in conformity with [the] regulations."  *Ahearn v. Astrue*, 2010 WL 653712, *4 (N.D.N.Y. 2010) (citing *Woodford v. Apfel*, 93 F. Supp. 2d 521, 528 (S.D.N.Y. 2000)).

To require consideration by the Appeals Council, the evidence must be both "(1) new and not 'merely cumulative of what is already in the record' and (2) material, meaning 'both relevant to the claimant's condition during the time period for which benefits were denied and probative.'"  *Shields v. Astrue*, 2012 WL 1865505, *2 (E.D.N.Y. 2012) (quoting *Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991)).  To be material, there must be "a reasonable possibility

that the new evidence would have influenced the [Commissioner] to decide claimant's application differently." *Jones v. Sullivan*, 949 F.2d at 60.  "If the Appeals Council fails to consider new, material evidence, 'the proper course for the reviewing court is to remand the case for reconsideration in light of the new evidence.'"  *Ahearn v. Astrue*, 2010 WL 653712 at *4 (quoting *Shrack v. Astrue*, 608 F. Supp. 2d 297, 302 (D. Conn. 2009)).

I find that the Appeals Council did not err.  Having reviewed the entire record, I conclude that there is no reasonable possibility that the GMHC records would have altered the ALJ's decision.  The ALJ reviewed records from GMHC reflecting Brito's treatment between February and September 2011.  (Tr. 51).  Those records included Brito's intake appointments, therapy sessions treatment notes and reports, and medication evaluations.  (Tr. 397-432).  According to the records, Brito commenced mental health treatment to address depressed moods and trouble sleeping.  (*Id.*).  He was provided therapy and medication, which generally improved his mood and assisted his sleep, although he continued to report some low moods and feelings of grief.  (*Id.*).  The ALJ recounted the treatment notes, recognizing that Brito reported depressive symptoms due to grief, but that his mental health examinations were otherwise generally unremarkable.  (Tr. 40).

The records submitted by Brito on appeal contain treatment notes from his continued mental health treatment at GMHC between October 2011 and November 2012.  (Tr. 548-73).  As described in detail above, those treatment notes reflect that his mental health remained stable with treatment, that his sleep improved and that he sometimes experienced improvement in his depressive symptoms, although he continued to report some symptoms, including low moods and ruminating thoughts.  (Tr. 552-55, 559-60, 565-67, 573).  The notes do

not suggest that Brito's mental health deteriorated or that he experienced any new symptoms. (*Id.*).

In reaching her step two determination, the ALJ relied upon the GMHC treatment notes and Rudd's opinion that demonstrated that Brito suffered from only mild to moderate mental limitations.  (Tr. 40-41).  In formulating Brito's mental RFC assessment, the ALJ also relied upon Jones's evaluation that concluded that Brito had the mental capacity to perform simple and complex work and to function adequately in the workplace.  (Tr. 45).  The ALJ determined that Brito's mental impairments did not cause more than minimal limitations in his ability to perform basic mental work activities and were thus nonsevere.  (*Id.*).  The ALJ nonetheless proceeded to consider Brito's mental limitations throughout the remainder of the sequential evaluation, including the RFC assessment.[16]  (Tr. 42-46).

Brito maintains that the ALJ would not have concluded that his mental health evaluations were "consistently within normal limits" had the ALJ reviewed the additional GMHC records.  According to Brito, the additional GMHC records reflect mental health evaluations that were not normal, including indications of increased medication dosages, depressed moods, negative ruminations and racing thoughts.  (Docket # 10-1 at 14).  The symptoms described in the additional GMHC treatment records, however, are materially identical to the symptoms described in the original GMHC treatment records.  In other words,

---

[16]  To the extent that Brito argues that the ALJ erred at step two by determining that his mental impairments were not severe, I conclude that any purported error was harmless because the ALJ considered Brito's mental impairments during the remainder of the sequential analysis.  *See Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (an error at step two may be harmless if the ALJ identifies other severe impairments at step two, proceeds through the remainder of the sequential evaluation process and specifically considers the "nonsevere" impairment during subsequent steps of the process); *Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 311-12 (W.D.N.Y. 2013) ("[a]s a general matter, an error in an ALJ's severity assessment with regard to a given impairment is harmless . . . when it is clear that the ALJ considered the claimant's [impairment] and their effect on his or her ability to work during the balance of the sequential evaluation process") (internal quotations omitted).

the records show that Brito's mental health was generally stable, if not somewhat improved, with treatment.

Brito also maintains that the additional GMCH records conflict with Jones's opinion[17] because Jones diagnosed Brito as being alcohol dependent, but the GMHC records demonstrate that by March 2012 Brito had maintained sobriety for over one year.  (*Id.* at 14-15).  Although far from clear, Brito seems to be contending that both the ALJ and Jones opined that his mental health impairments were caused solely by his alcohol consumption – an opinion belied by the fact that he continued to have mental health issues a year after he stopped drinking.  (*Id.*).  The record does not support Brito's argument.  (*Id.*).  Although Jones evaluated Brito before he achieved sobriety, she nevertheless opined that he suffered from both alcohol dependence and depressive disorder.  (*Id.*).  Jones opined that Brito's substance abuse problems were not "significant enough to interfere with [his] ability to function on a daily basis." (Tr. 342).  In her decision, the ALJ explicitly discussed Brito's chemical dependence treatment and noted that "by November 2011, the claimant had remained alcohol-free for almost 11 months." (Tr. 40-41).  The ALJ specifically found that Brito's alcohol abuse was in remission and thus was nonsevere.  (Tr. 39).

In sum, I discern no conflict between the GMHC records submitted on appeal and Jones's opinion or the ALJ's determination.  Thus, there is no reasonable possibility that they would have altered the ALJ's determination.  *See Ferguson v. Astrue*, 2013 WL 639308, *4 (N.D.N.Y. 2013) (remand not required where "the opinions and diagnoses offered by both the therapists and psychiatrist [did] not contradict any of the ALJ's findings" and where "[t]he new evidence [was] clearly not probative and, even if received prior to the decision of the ALJ, would

---

[17] Brito also contends that the ALJ mischaracterized a portion of Jones's opinion.  (*Id.*).  That contention is addressed *infra*.

not have influenced the decision"); *Duross v. Comm'r of Soc. Sec.*, 2008 WL 4239791, *4

(N.D.N.Y. 2008) (the new evidence "is not material because there is no reasonable possibility

that it would have influenced the Commissioner to decide [plaintiff's] application differently").

## 2. Evaluation of Opinion Evidence

I turn next to Brito's contentions that the ALJ erred by failing to assign a

particular weight to Rudd's opinion.  (Docket # 10-1 at 23-25).  According to Brito, the ALJ's

error was not harmless because Rudd opined that Brito suffered from limitations greater than

those incorporated into the ALJ's RFC determination.  (*Id.*).

An individual's RFC is his "maximum remaining ability to do sustained work

activities in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel,* 198

F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (1996)).  In making an

RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities,

symptomology, including pain and other limitations which could interfere with work activities

on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009)

(citing 20 C.F.R. § 404.1545(a)).  "To determine RFC, the ALJ must consider all the relevant

evidence, including medical opinions and facts, physical and mental abilities, non-severe

impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL

1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 380 F. App'x 231 (2d

Cir. 2010).

An ALJ should consider "all medical opinions received regarding the claimant."

*See Speilberg v. Barnhart*, 367 F. Supp. 2d 276, 281 (E.D.N.Y. 2005) (citing 20 C.F.R.

§ 404.1527(d)).  In evaluating medical opinions, regardless of their source, the ALJ should

consider the following factors:

(1)     the frequency of examination and length, nature, and extent
        of the treatment relationship;

(2)     the evidence in support of the physician's opinion;

(3)     the consistency of the opinion with the record as a whole;

(4)     whether the opinion is from a specialist; and

(5)     whatever other factors tend to support or contradict the
        opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010); *see Speilberg v. Barnhart*,

367 F. Supp. 2d at 281 ("factors are also to be considered with regard to non-treating sources,

state agency consultants, and medical experts") (citing 20 C.F.R. §§ 404.1527(d) and (e)); *House*

*v. Astrue*, 2013 WL 422058, *3 (N.D.N.Y. 2013) ("[m]edical opinions, regardless of the source

are evaluated considering several factors outlined in 20 C.F.R. §§ 404.1527(c), 416.927(c)").

Licensed clinical social workers are not considered "acceptable medical sources"

under the regulations.  20 C.F.R. § 404.1513(a).  Instead, clinical social workers are considered

to be "other sources" within the meaning of 20 C.F.R. §§ 404.1513(d) and 416.913(d).  As such,

their opinions "cannot establish the existence of a medically determinable impairment."  *See* SSR

06-03P, 2006 WL 2329939, *2 (2006).  Their opinions may be used, however, "to show the

severity of the individual's impairment(s) and how it affects the individual's ability to function."

*See id.*

Social Security Ruling 06-03P recognizes that "[m]edical sources . . . , such as . . .

licensed clinical social workers, have increasingly assumed a greater percentage of the treatment

and evaluation functions previously handled primarily by physicians and psychologists."  *Id.* at

*3.  The ruling recognizes that such opinions are "important and should be evaluated on key

issues such as impairment severity and functional effects, along with the other relevant evidence

in the file." *Id.*  The ruling directs the ALJ "to use the same factors for evaluation of the

opinions of acceptable medical sources to evaluate the opinions of medical sources who are not

acceptable medical sources, including licensed social workers."  *Genovese v. Astrue*, 2012 WL

4960355, *14 (E.D.N.Y. 2012) (internal quotations omitted).  "An ALJ is not required to give

controlling weight to a social worker's opinion; although he is not entitled to disregard it

altogether, he may use his discretion to determine the appropriate weight."  *Cordero v. Astrue*,

2013 WL 3879727, *3 (S.D.N.Y. 2013); *Jones v. Astrue*, 2012 WL 1605566, *5 (N.D.N.Y.)

("the Second Circuit has held that 'the ALJ has discretion to determine the appropriate weight to

accord the [other source's] opinion based on all the evidence before him") (quoting *Diaz v.*

*Shalala*, 59 F.3d 307, 313-14 (2d Cir. 1995)), *report and recommendation adopted*, 2012 WL

1605593 (N.D.N.Y. 2012).

      As an initial matter, it is unclear whether Brito is correct that the ALJ failed to

assign a particular weight to Rudd's opinion.  In her decision, the ALJ discussed Rudd's opinion

at length and concluded that the opinion was "instructive" and supported the other opinions

relied upon by the ALJ in reaching her conclusion that Brito's "mental impairments cause only

mild to moderate limitations in his ability to function."  (Tr. 41).  This statement suggests that the

ALJ concluded that Rudd's opinion was consistent with her step two determination, RFC

assessment and the other credited opinions of record regarding Brito's mental impairments.

      In any event, the ALJ thoroughly discussed Rudd's findings, which were

generally consistent with the ALJ's RFC assessment; any failure to assign a specific weight to

the opinion was thus harmless and does not require remand.  *See Arguinzoni v. Astrue*, 2009 WL

1765252, *9 (W.D.N.Y. 2009) (ALJ's failure to assign weight to medical opinions was harmless;

"[t]he ALJ engaged in a detailed discussion of the medical opinions in the record and his

determination that the plaintiff was not disabled does not conflict with the medical opinions"); *Pease v. Astrue*, 2008 WL 4371779, *8 (N.D.N.Y. 2008) ("[t]he ALJ provided a detailed summary and analysis of the reports and records of all treating and examining physicians[;] . . . [t]herefore, the ALJ's failure to comment on the weight of the evidence was harmless error, and does not provide a basis for a remand to the Commissioner"); *Jones v. Barnhart*, 2003 WL 941722, *10 (S.D.N.Y. 2003) ("[the ALJ] engaged in a detailed discussion of [the opinions], and his decision does not conflict with them[;] [t]herefore, the ALJ's negligence was harmless error, and does not provide a basis for a remand to the Commissioner"); *see also Ryan v. Astrue*, 650 F. Supp. 2d 207, 217 (N.D.N.Y. 2009) ("despite granting little weight to [the doctor's] opinions, [the ALJ] accounted for [p]laintiff's difficulties with concentration and stress in his RFC[;] [t]herefore, had the ALJ opted to grant [the doctor] a greater weight, it would not have affected his RFC").

Brito contends that the ALJ's purported failure to assign a specific weight to Rudd was not harmless because Rudd found greater limitations than those incorporated into the ALJ's RFC.  Specifically, Brito contends that Rudd assessed him to have limitations in his ability to maintain concentration, interact with others and respond appropriately to usual work situations and to changes in a routine work setting.  (Docket # 10-1 at 19).  According to Brito, the ALJ's assessment failed to incorporate these limitations.  (*Id.*).  I disagree with Brito that Rudd's opinion conflicts with the ALJ's RFC assessment.

In explaining her assessed limitations, Rudd stated that Brito's depression "impact[ed]" his ability to concentrate on tasks, but nevertheless opined that he was able to understand and remember simple instructions and could carry out both simple and complex instructions.  (Tr. 434).  Rudd also opined that Brito's concentration deficiency caused him to

have a moderate limitation – *i.e.*, "more than a slight limitation but still able to function

satisfactorily" – in his ability to understand and remember complex instructions.  (*Id.*).

Consistent with Rudd's opinion, the ALJ concluded that Brito retained the mental RFC to

maintain attention and concentration as necessary to perform simple and complex instructions

and perform complex tasks independently.  (Tr. 42).  The ALJ's RFC assessment is thus

consistent with Rudd's assessed limitations.

      Rudd likewise noted that Brito's ability to interact with others was "impacted" by

his depression, but nevertheless concluded that he had no limitations in his ability to interact with

the public, supervisors or coworkers.  Rudd also opined that Brito had a moderate limitation for

responding appropriately to usual work situations and to changes in a routine work setting.  The

ALJ's RFC accounted for that limitation by limiting Brito to a low-stress work environment.

(*Id.*).  In sum, Brito has failed to identify any conflict between Rudd's opinion and the ALJ's

RFC assessment.

      Brito also maintains that the ALJ's RFC assessment was flawed because she

improperly accorded "great weight" to the opinion of Jones, a one-time examining physician.

(Docket # 10-1 at 26-27).  According to Brito, Jones's opinion was inconsistent with the mental

status examinations of his treating providers and Rudd's opinion.  (*Id.*).

      As an initial matter, I disagree that Jones's opinion is not entitled to "great

weight" because she only examined him on one occasion.  "The opinion of a consultative

examiner can constitute substantial evidence supporting an ALJ's decision."  *See Fuentes v.*

*Colvin*, 2015 WL 631969, *8 (W.D.N.Y. 2015) (quoting *Leisten v. Colvin*, 2014 WL 4275710,

*14 (W.D.N.Y. 2014) ("[t]he report of a consultative physician who examines the [p]laintiff and

reaches conclusions based upon a one-time examination may constitute substantial evidence in support of the ALJ's decision")).

I also disagree that Jones's opinion is inconsistent with Brito's mental health treatment records or Rudd's opinion. As discussed above, the treatment records reflect that Brito suffered from depression, often triggered by grief, but that he appeared to be generally stable with therapy and medication. Although the treatment records reflect that Brito continued to have low moods and negative thoughts, his mental health examinations routinely demonstrated otherwise normal findings.

Rudd's opinion is not to the contrary. While recognizing that Brito suffered from depression, Rudd assessed few limitations in mental work-related activities, and none were marked or extreme. Those that she did assess were primarily mild, with two moderate limitations noted. Rudd opined that despite his mental impairments, Brito was able to interact with others and perform simple and complex tasks in a routine work setting. Similarly, Jones assessed that Brito suffered from alcohol dependence and depressive disorder, but could follow and understand simple directions and perform simple and complex tasks while interacting adequately with others, maintaining concentration and a regular schedule. I conclude that Jones's opinion is consistent with Rudd's opinion and the treatment records, and that the ALJ applied the correct legal standard in according Jones's opinion "great weight" and properly concluded that Jones's opinion was consistent with the other medical evidence of record, including the treatment notes and Rudd's opinion.

In any event, after an independent review of the existing record, including Rudd's and Jones's opinions and the treatment records, I conclude that the ALJ's mental RFC assessment was supported by substantial evidence. As discussed above, the treatment records

reveal that Brito suffered from depression but was generally stable, if not somewhat improved, with treatment and medication. Both Rudd and Jones opined that Brito was able to perform simple and complex tasks in a routine work setting and that he suffered from generally mild mental limitations, although they noted that Brito might have some difficulty dealing with stress or changes in a work routine. The ALJ's decision accounted for those limitations by concluding that Brito could perform simple and complex tasks, but only in a low-stress environment. The ALJ's RFC assessment was based upon a thorough review of the record and was supported by substantial record evidence; accordingly, remand is not warranted. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) ("[n]one of the clinicians who examined [claimant] indicated that she had anything more than moderate limitations in her work-related functioning, and most reported less severe limitations[;] [a]lthough there was some conflicting medical evidence, the ALJ's determination that [p]etitioner could perform her previous unskilled work was well supported").

### 3.      Mischaracterization of Medical Evidence

Brito also challenges the ALJ's step two determination and mental RFC assessment on the grounds that the ALJ incorrectly characterized some of the medical evidence. (Docket # 10-1 at 16-19). Brito identifies four alleged mischaracterizations: (1) the ALJ improperly characterized the GMHC treatment records as reflecting that Brito's mental status was consistently within normal limits; (2) the ALJ failed to fully discuss Rudd's opinion and improperly concluded that it demonstrated only mild to moderate mental limitations; (3) the ALJ improperly discounted Blackwell's opinion on the grounds that it was inconsistent with Jones's findings of intact memory and concentration; and, (4) the ALJ misinterpreted Jones's opinion that Brito had difficulty dealing with stress by stating that Brito's stress-related limitations were due solely to his alcohol use. (*Id.*).

With respect to the first two alleged mischaracterizations, I disagree with Brito for the reasons explained at length above. As articulated *supra*, my review of the GMHC records reveals that the ALJ's characterization of them was not erroneous. Further, I conclude that the ALJ fully discussed and accurately recounted Rudd's opinion that Brito suffered from some mild to moderate mental limitations.

Regarding Blackwell's opinion, I conclude that any mistake by the ALJ was ultimately harmless. In the opinion, Blackwell assessed that Brito suffered from moderate limitations in his ability to maintain attention, concentration and pace. (Tr. 366). Blackwell further assessed that Brito would have moderate limitations maintaining a regular schedule and completing a normal workday or workweek without interruptions due to his impairments. (Tr. 370-72). Blackwell explained that Brito appeared capable of sustaining employment while sober but that his "level of alcohol use might cause moderate limitations in his ability to sustain a regular schedule and complete a normal work day." (Tr. 372). The ALJ rejected Blackwell's limitations, concluding that they were inconsistent with Jones's examination that demonstrated that Brito's attention and memory were intact. (Tr. 40). The ALJ alternatively concluded that the limitations assessed by Blackwell were based solely upon Brito's alcohol use, which, if credited, would require a finding that Brito's alcohol use was material. (*Id.*).

Brito maintains that Jones's examination did not demonstrate that his memory was intact, but instead demonstrated that it was "mildly impaired." (Tr. 341). Brito is correct, and the ALJ misstated Jones's findings in this respect. The misstatement, however, was harmless because the ALJ alternatively discounted Blackwell's limitations on the grounds that they were based solely on Brito's continued alcohol consumption. As discussed above, the record demonstrates that Brito had made significant progress in achieving sobriety subsequent to

Blackwell's evaluation.  Those efforts were well-documented in the GMHC treatment notes and in Rudd's opinion.  The ALJ recognized Brito's efforts and progress and concluded that his alcohol use was not material to the disability evaluation.  Accordingly, the limitations assessed by Blackwell, which were based upon Brito's continued use of alcohol at the time, were properly rejected by the ALJ as unsupported by the record as a whole.

Finally, I agree with Brito that the ALJ may have mischaracterized Jones's stress-related assessment, but conclude that any mischaracterization was harmless.  Jones opined that Brito "cannot appropriately deal with stress, as he only does so by drinking."  (Tr. 342).  In discussing Jones's opinion, the ALJ stated that Jones had assessed Brito with difficulty "appropriately dealing with stress – but because of his drinking."  (Tr. 45).  I agree with Brito that the language suggests the possibility that the ALJ understood Jones's assessment to mean that Brito suffered from stress-related limitations only when he was consuming alcohol – a conclusion not reasonably supported by the language of Jones's opinion.[18]  Even if the ALJ's decision is read to reflect this improper interpretation, however, the ALJ nonetheless accounted for stress-related limitations by limiting Brito to a low-stress work environment.  Any error was thus harmless.

**B.      Physical RFC Assessment**

Brito challenges the ALJ's physical RFC assessment on three separate grounds.  First, he maintains that the ALJ's conclusion that Brito required the option to sit and stand at will

---

[18]  The hearing examination, by contrast, suggests that the ALJ correctly understood Jones's opinion:

> Q:  How do you -- how are you going with the stress?  It says in the record
>     that -- at least one person, one of the doctors who saw you thought that you
>     dealt with stress by drinking.  Was that so?
>
> A:  Yes, ma'am.

(Tr. 80).

was not supported by any medical opinion of record and thus constituted the ALJ's own lay

opinion. (Docket # 10-1 at 21). Next, Brito maintains that the ALJ improperly relied upon the

"vague" opinion provided by Balderman. (*Id.* at 22). Finally, Brito contends that the ALJ failed

to account for some of the limitations assessed by Montgomery. (*Id.* at 22-24). These

contentions are entirely devoid of merit.

  The record overwhelmingly supports the ALJ's physical RFC assessment. The

medical records demonstrate that after his surgery in 2005, x-rays of Brito's leg and ankle were

unremarkable and showed a successful surgery. Brito did not seek any further treatment for his

leg or ankle pain for approximately five years, until November 2010, well after he had filed his

application for benefits. (Tr. 189-99, 459-60). Brito stated that he is able to complete

housework and yardwork, go shopping, ride his bicycle and that his physicians encouraged him

to take long walks. (Tr. 67, 72, 227-28). The last physician at Strong to examine Brito opined

that he could frequently lift and carry up to twenty pounds and occasionally lift up to one

hundred pounds, could stand or walk for a total of eight hours a day and could sit for a total of

six hours a day. (Tr. 438-39). The consulting examiner's physical examination was generally

unremarkable and he assessed a mild limitation for climbing and prolonged walking. (Tr. 335).

I easily conclude that the medical evidence of record supports the ALJ's conclusion that Brito

was capable of performing the requirements of light work with a sit/stand option and some

postural limitations.[19]

---

[19] Given the treatment notes and medical opinion evidence in the record, Brito's counsel's decision to challenge the ALJ's physical RFC assessment is surprising. As an advocate for a client, it is the attorney's duty to "objectively consider points to be raised . . . and to eliminate those points that have little or no merit." *United States v. Visinaiz*, 428 F.3d 1300, 1317 (10th Cir. 2005), *cert. denied*, 546 U.S. 1123 (2006). *See Jones v. Barnes*, 463 U.S. 745, 751-53 (1983) ("[a] brief that raises every colorable issue runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions"). *See also Henriksen v. Astrue*, 2009 WL 2588695, *4-5 (N.D. Ill. 2009); *Seamon v. Barnhart*, 2006 WL 517631, *7 (W.D. Wis. 2006).

The ALJ's decision makes clear that she assessed a sit/stand option based upon Brito's testimony during the hearing that he needed to shift positions to relieve his knee pain. (Tr. 46). Specifically, Brito testified that he would have to be able to alternate between sitting and standing every half hour. (Tr. 92-93). To suggest that the ALJ's decision to credit Brito's testimony warrants remand is as frivolous as it is meritless. *See Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) ("[a]lthough the ALJ's conclusions may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole").

I similarly conclude that Brito's argument that the ALJ improperly relied upon the "vague" opinion of Balderman is meritless. Although an expert opinion may describe a claimant's impairments in terms that are so vague as to render the opinion useless, *see Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013), the use of vague phrases by a consultative examiner does not automatically render an opinion impermissibly vague, *see Rosenbauer v. Astrue*, 2014 WL 4187210, *16 (W.D.N.Y. 2014) (collecting cases). In this case, Balderman provided an assessment after conducting a thorough examination of Brito. During the examination, Balderman noted that Brito did not appear to be in acute distress, was able to stand on his heels but not his toes, could fully squat, had a normal stance and a mild limp, had full flexion, extension, lateral flexion and full rotary movement in his cervical and lumbar spine. (Tr. 333-38). Additionally, Balderman reviewed images of Brito's left ankle and leg. (*Id.*). Accordingly, Balderman's opinion that Brito would have mild limitations in climbing and prolonged walking "was based upon medical examination, evaluation and observation, and the ALJ thus properly relied upon [Balderman's] opinion to support [his] RFC assessment." *See Rosenbauer v. Astrue*, 2014 WL 4187210 at *17 (collecting cases). In any event, as described

above, the physical RFC assessment is consistent with and supported by other substantial evidence in the record, including the treatment notes and Montgomery's opinion.

Finally, I reject Brito's contention that a remand is warranted because the ALJ did not account for the upper extremity limitations (including frequent reaching, handling, fingering, feeling, pushing and pulling limitations) or the temperature and noise limitations assessed by Montgomery. As noted by the ALJ, the treating records demonstrate that Montgomery evaluated Brito on a single occasion, and the ALJ thus properly determined to accord Montgomery's opinion "great, but not controlling weight." *See Wearen v. Colvin*, 2015 WL 1038236, *14 (W.D.N.Y. 2015) ("I disagree with [plaintiff's] characterization of [the doctor] as a treating doctor because the record reflects that [the doctor] only treated [plaintiff] on one occasion before rendering her opinion") (citing *Hamilton v. Astrue*, 2013 WL 5474210, *11 (W.D.N.Y. 2013) ("it is not clear that [the doctor] may be considered a treating physician because [plaintiff] testified that the first time she was examined by [the doctor] was when he completed her disability paperwork") (collecting cases)). A review of Montgomery's treatment records reveal that he evaluated Brito for his hypertension, osteoarthritis and alcohol abuse. (Tr. 467-68). Nothing in those records suggest that Brito suffered from any limitations in his upper extremities or that he had any sensitivities to noise or temperature. (*Id.*).

Indeed, the record is devoid of any suggestion that Brito suffered from upper extremity, temperature or noise limitations. The remainder of Brito's treatment records contain nothing to suggest that Brito had any such limitations. Further, Balderman's examination demonstrated full range of motion and strength in the upper extremities and intact hand and finger dexterity. (Tr. 335). Similarly, the disability report that Brito completed in connection with his application for benefits was silent as to any upper extremity or environmental

limitations.  (Tr. 225-34).  Significantly, Brito did not indicate any limitations with reaching, using his hands or hearing.  (Tr. 230).  Finally, during the administrative hearing, Brito did not testify that he suffered from such limitations.  In fact, the ALJ specifically asked Brito whether he suffered from any limitations that had not been discussed.  (Tr. 80 ("[a]re you having any other symptoms or problems that we haven't already talked about?")).  Brito replied that he did not.  (*Id.*).

  In sum, I conclude that the ALJ properly evaluated Montgomery's opinion and that her RFC assessment adopted those limitations assessed by Montgomery that were supported by the record evidence in the record.  The ALJ's physical RFC assessment was reasonable and supported by substantial evidence.  *Pellam v. Astrue*, 508 F. App'x 87, 90-91 (2d Cir. 2013) ("even if the ALJ did not credit all of [the doctor's] findings, [the doctor's] medical opinion largely supported the ALJ's assessment of [claimant's] [RFC]").

  **C.** **Step Five Assessment**

  Finally, I turn to Brito's contention that the ALJ erred in relying on the vocational expert because the hypothetical posed to the expert was based upon a flawed RFC assessment.  (Docket ## 10-1 at 27-29; 14 at 5-6).  Having determined that substantial evidence supports the ALJ's RFC determination, this argument is rejected.  *See Wavercak v. Astrue*, 420 F. App'x 91, 95 (2d Cir. 2011) ("[b]ecause we have already concluded that substantial record evidence supports the RFC finding, we necessarily reject [plaintiff's] vocational expert challenge").

**CONCLUSION**

  After careful review of the entire record, this Court finds that the Commissioner's denial of SSI/DIB was based on substantial evidence and was not erroneous as a matter of law.

Accordingly, the ALJ's decision is affirmed.  For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 11)** is **GRANTED**.  Brito's motion for judgment on the pleadings **(Docket # 10)** is **DENIED**, and Brito's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**

_s/Marian W. Payson_

MARIAN W. PAYSON
United States Magistrate Judge

Dated:  Rochester, New York
       March 31, 2015